**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DWAYNE BRUCE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 11-cv-3138 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| PARTHASARATHI GHOSH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Wexford Defendants' motion for summary judgment [157]. For the reasons set forth below, the Court grants Defendants' motion. Regarding the remaining Defendant—former Warden Marcus Hardy—Plaintiff is given 30 days from the date of this order either (a) to file a motion explaining to the Court why he should be permitted to proceed on his claim against Warden Hardy, or (b) to voluntarily dismiss his claim against Warden Hardy. If Plaintiff fails to take either action within 30 days of the date of this order, or if Plaintiff's arguments are not persuasive, the Court will grant summary judgment in favor of Warden Hardy.

**I.      Facts**

The Court takes the relevant facts from the parties' Local Rule 56.1 statements, construing the facts in the light most favorable to the nonmoving party (here, Plaintiff).[1]

Plaintiff Dwayne Bruce is an inmate at the Stateville Correctional Center—a prison within the Illinois Department of Corrections ("IDOC")—who suffers from chronic knee pain.

---

[1] Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The rule permits a movant to file up to 80 separately-numbered statements of undisputed facts. L.R. 56.1(a)(3). The rule also requires the nonmovant to file a concise response to the movant's statement of facts setting forth "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(3)(A).

The State of Illinois contracts with Wexford Health Sources, Inc. to provide medical services to IDOC inmates. On May 11, 2011, Plaintiff brought a civil action under 28 U.S.C. § 1983 against Wexford and certain medical staff at Stateville alleging that Defendants failed to provide him with adequate medical care. The Court appointed Plaintiff counsel, and on September 13, 2012, Plaintiff filed his First Amended Complaint, naming the following defendants: (1) Wexford Health Sources, Inc., (2) Dr. Parthasarathi Ghosh (former Stateville Medical Director; a Wexford employee), (3) Dr. Saleh Obaisi (current Stateville Medical Director; a Wexford employee), and (4) Marcus Hardy (former Stateville Warden, an IDOC employee).[2] On May 8, 2014, Plaintiff filed his Second Amended Complaint, adding Dr. Imhotep Carter (former Stateville Medical Director; a Wexford employee) as the fifth defendant. On September 15, 2014—40 months after Plaintiff filed this lawsuit—the Wexford Defendants[3] (hereinafter, "Defendants") moved for summary judgment, arguing that (1) Plaintiff failed to exhaust the administrative remedies available to him prior to bringing this lawsuit, and (2) Plaintiff cannot establish that Defendants were deliberately indifferent to his medical needs.

### A.    Plaintiff's Medical Treatment

Plaintiff began experiencing noticeable pain in his left knee in May of 2010.[4] The early symptoms were that his knee would occasionally "pop out" while he was lying in bed, and those symptoms gradually increased to include fluctuating periods of pain, swelling, and popping of

---

[2] Pursuant to Federal Rule of Civil Procedure 25(d), "when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending[, t]he officer's successor is automatically substituted as a party." Accordingly, Stateville's current Warden, Tarry Williams, is the appropriate successor defendant.

[3] The term "Wexford Defendants" refers to all named defendants except for former Stateville Warden Marcus Hardy—an IDOC employee—whom Plaintiff is suing in his official capacity "for the purpose of preserving the matter for the recovery of costs and attorney's fees as a prevailing party under 42 U.S.C.A. § 1988." [140, at 2 n.1.] Defendant Hardy did not move for summary judgment.

[4] There is some evidence that Plaintiff experienced knee pain before May 2010 (and even consulted with Stateville physicians regarding that pain before May 2010), but for purposes of this lawsuit Plaintiff admits that his left-knee pain began in May of 2010. [179, ¶ 26.]

varying severity. The cause of Plaintiff's knee pain is unknown, although it likely stems from a combination of events, including a gunshot wound to that knee that occurred in 1984, and Plaintiff's involvement in various sports activities. While Plaintiff described the pain as "severe" at times, he never missed a day of work at the Stateville furniture factory and he continued to participate in yard time, although he had to limit his participation in certain physical activities, such as basketball and weightlifting.

As his knee pain increased, Plaintiff began submitting weekly sick-call requests to be seen by a physician (or another member of the medical staff). After approximately two months, on July 23, 2010 Plaintiff was seen by Stateville Physician's Assistant LaTanya Williams, where Plaintiff reported the swelling and pain in his knee, noting that he had difficulty moving from a squatting to an upright position. Ms. Williams reported that Plaintiff's left knee had crepitus upon palpation, but also demonstrated a full range of motion and good strength and stability. She prescribed Plaintiff Ibuprofen for the pain, scheduled an x-ray for his knee and a follow-up appointment with Dr. Ghosh, and recommended that Plaintiff receive a knee brace.

Consistent with Ms. Williams's recommendations, Plaintiff's knee was x-rayed on or about August 23, 2010. He was scheduled for a follow-up with Dr. Ghosh on September 23, 2010,[5] but the appointment got pushed to October 12, 2010. This would be the only time that Dr. Ghosh ever met with Plaintiff. Upon reviewing Plaintiff's x-ray and his medical history, Dr. Ghosh reported that Plaintiff had degenerative joint disease, likely stemming from the gunshot wound and/or a meniscal tear. The doctor prescribed Plaintiff Naproxen for the pain and ordered Plaintiff a knee brace (he never got the one that Ms. Williams ordered). Dr. Ghosh claims that he intended to send Plaintiff to an outside specialist for an MRI, but he either forgot

---

[5] Plaintiff wrote a letter to Dr. Ghosh on September 26, 2010 describing his knee pain and requesting an appointment with the doctor. [179-1, at 1–2.]

to complete the referral form (contrary to his standard practices) or else he unintentionally misplaced the referral form. Dr. Ghosh didn't successfully submit his referral until January 24, 2011 (and he subsequently retired two months later, in March 2011). Upon reflection, Dr. Ghosh commented that because Plaintiff's chronic knee pain had existed for years, it was not necessary to expedite Plaintiff's referral for the MRI, meaning that the delay did not create a substantial health risk for Plaintiff. Wexford reviewed and approved the doctor's referral, and Plaintiff received an MRI on May 6, 2011. On June 13, 2011, Stateville's interim Medical Director, Dr. Bautista, met with Plaintiff to review his MRI, which showed a non-acute tear of Plaintiff's ACL and lateral meniscus. The following day Dr. Bautista referred Plaintiff for a consultation with an orthopedic specialist, which Wexford denied.

Six months later, on December 15, 2011, Plaintiff saw Stateville's new (as of July 25, 2011) Medical Director, Dr. Carter, about his continuing knee troubles.[6] Dr. Carter advised Plaintiff to continue using his knee brace (although Plaintiff said it didn't help), and he prescribed Plaintiff a stronger pain medication, Ultram. Dr. Carter also recommended that Plaintiff see an orthopedic specialist, which he expressed verbally to Plaintiff and noted in his evaluation, but he failed to submit an actual referral, and so no appointment was scheduled.

Approximately one year later, on November 1, 2012, Plaintiff saw yet another new Medical Director, Dr. Obaisi, about his knee pain. That same day, Dr. Obaisi completed a

---

[6] Plaintiff wrote a letter to Dr. Carter on September 5, 2011, noting that Wexford had denied a referral for him to see an outside specialist, that several of his sick-call requests had gone unanswered, and that his current pain medication was not effectively alleviating his pain. He asked Dr. Carter to follow-up on his sick-call requests (and possibly to submit another referral for Plaintiff to see an outside specialist), and to prescribe Plaintiff a stronger pain medication. Plaintiff summarized his medical status by noting, "my condition hasn't changed." [See 179, ¶ 8; 179-1, at 9–10.] While Plaintiff did not see Dr. Carter until December 15, 2011 (*i.e.*, three months later), his medical records show that he was seen by a CMT on three occasions in the three months between his letter and his visit with Dr. Carter—9/27/11, 10/29/11, and 11/9/11 [172-10, at 20–22 (under seal)]—although there is no indication if these visits were conducted at Dr. Carter's request.

referral form to have Plaintiff sent to an orthopedic specialist, and Wexford approved the referral on November 19, 2012. On March 4, 2013—two years and seven months after filing his first grievance—Plaintiff was seen by a board-certified orthopedic surgeon, Dr. Samuel Chmell. The doctor reviewed Plaintiff's May 6, 2011 MRI (which was nearly two-years old at the time), noting that Plaintiff had a non-acute ACL tear with an adjacent ganglion cyst (*i.e.*, a soft-tissue lump or tumor filled with gelatinous fluid), a lateral meniscal tear, and moderate osteoarthritis. Dr. Chmell performed a Kenalog injection in Plaintiff's knee, which acts both as a pain reliever and an indicator of the source of the knee pain. The doctor recommended that Plaintiff undergo another MRI (which occurred on July 15, 2013) and additional x-rays (which occurred on April 23, 2013) before returning for a follow-up visit, noting the possibility that Plaintiff might need arthroscopic surgery due to the meniscal tear.

Plaintiff saw Dr. Chmell for a follow-up visit on July 22, 2013, where Plaintiff reported that the Kenalog injection did not relieve his pain, which was now constant. Dr. Chmell recommended that Plaintiff undergo arthroscopic surgery on his left knee to repair the meniscal tear. The surgery—originally scheduled for August 20, 2013—occurred on September 10, 2013. In a follow-up visit with Dr. Chmell on September 23, 2013, the doctor reported that there were no issues with the surgery, and that Plaintiff could return for corticosteroid injections once or twice a year as needed to treat his chronic knee pain.

### B.      Plaintiff's Grievances

Plaintiff submitted 11 grievances relating to his continuing knee problems. [See 172-1, at 1–28.] The first six of these grievances pre-date Plaintiff's complaint, and the remaining five grievances post-date the original complaint but pre-date Plaintiff's first amended complaint. The 11 grievances spawned six separate responses from Plaintiff's grievance officer, all of which

were approved by the Warden. [See 172-1, at 9, 14, 17, 20, 25, 28.] The consistent message from the grievance officer—which in some instances was accurate and in other instances was not—was that Plaintiff's issues had been fully resolved, thus requiring no further action.

There is a dispute over whether Plaintiff appealed any of the six decisions that he received in response to his 11 grievances. Defendants said in their Rule 56.1 statement that Plaintiff did not appeal any of the decisions [172, ¶¶ 10, 13, 16, 19, 22, 25], and Plaintiff responded in each instance by saying that "whether Plaintiff has exhausted his administrative remedies is a legal conclusion and not a proper Rule 56.1 Statement of Material Fact." [179.] Notably, Plaintiff did not expressly affirm or deny any of Defendants' statements. But in his Statement of Additional Facts, Plaintiff attached two letters from the Administrative Review Board (*i.e.*, the apex of the appeal chain) dated April 5, 2012 and July 11, 2012 [see 179-1, at 16–17] evaluating the grievance officer's responses to Plaintiff's fifth through eleventh grievances. This implies that Plaintiff *did* file timely objections to those decisions (or else why would the Board have weighed in on those decisions?). Plaintiff references the Board's letters in his opposition to summary judgment, but (surprisingly) he doesn't argue that these letters were prompted by his timely objections to the grievance officer's decisions; instead, Plaintiff's only argument is that appeals were unnecessary because in each instance the grievance officer's response fully addressed his concerns, leaving nothing to appeal.

## II.    Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also *Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2) and noting that summary judgment should be granted "if the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*, 743 F. 3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Koszola v. Bd. of Educ. of City of Chi.*, 385 F. 3d 1104, 1111 (7th Cir. 2004). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

### III.    Analysis

#### A.    Exhaustion

##### 1.    Legal Standard

Defendants argue that they are entitled to summary judgment as a matter of law because Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation

Reform Act ("PLRA") and the Illinois Administrative Code. The PLRA says that "[n]o action shall be brought with respect to prison conditions[7] * * * by a prisoner * * * until such administrative remedies as are available are exhausted." 42 U.S.C. § 1977e(a)). The basic structure of the exhaustion requirement for Illinois inmates is one that should be familiar to attorneys, as it requires a grievant to show that he appealed his grievance, in a timely fashion, all the way up the chain of review. The grievance process in Illinois prisons is three-tiered:

> (1) An inmate "shall first attempt to resolve incidents, problems, or complaints * * * through his or her counselor." 20 Ill. Admin. Rule § 504.810(a).

> (2) If the inmate is unable to resolve the issue informally, "the individual may file a written grievance on a grievance form," which "shall be filed within 60 days after the discovery of the incident, occurrence, or problem that gives rise to the grievance." 20 Ill. Admin. Rule § 504.810(a). The inmate's grievance is then reviewed by a Grievance Officer, who "report[s] his or her findings and recommendations in writing to the Chief Administrative Officer," and then the Chief Administrative Officer is tasked with "advis[ing] the offender of the decision in writing within 2 months after receipt of the written grievance." 20 Ill. Admin. Rule § 504.830(d).

> (3) "If, after receiving the response of the Chief Administrative Officer, the offender still feels that the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director within 30 days after the date of the decision." 20 Ill. Admin. Rule § 504.850(a). The Director will either rule on the appeal, or else will send the appeal to an Administrative Review Board for resolution.

### 2. *Pavey*

Procedurally speaking, the Seventh Circuit has instructed the district courts in this circuit that as a matter of best practices, the issue of exhaustion should be resolved at the start of the case, before pretrial discovery begins. *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008). This decision gave birth to what this circuit now refers to as a *Pavey* hearing, where the district court—sometimes after allowing limited discovery solely on the issue of exhaustion—conducts

---

[7] The term "prison conditions" as used in the PLRA includes complaints about medical treatment. *Witzke v. Femal*, 376 F.3d 744, 751 (7th Cir. 2004) (citing *Perez v. Wisc. Dep't of Corr.*, 182 F.3d 532, 534 (7th Cir. 1999)).

an evidentiary hearing to decide whether the defendant has satisfied the exhaustion requirement. *Id.* Early resolution of the exhaustion issue both comports with the PLRA and promotes judicial economy by potentially allowing the parties to avoid the cost of discovery altogether. While Defendants did raise exhaustion as an affirmative defense, Defendants did not otherwise alert the Court of their intent to make an exhaustion argument before raising the issue in their summary judgment motion, 40 months after litigation began.

The Seventh Circuit's stance on early resolution of the exhaustion issue is more than just a suggestion; indeed, "*Pavey*'s central holding is that exhaustion is not a question for the jury at trial," meaning that the issue of exhaustion cannot, as a matter of law, survive beyond the summary judgment phase. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015); *Pavey*, 544 F.3d at 742 (noting that a prisoner does not have a Seventh Amendment right to a jury trial on factual issues related to exhaustion).

Not surprisingly, this is not the first instance where parties failed to make an exhaustion argument before the summary judgment stage. In instances such as this, there are essentially two options: (1) the court can deny the motion for summary judgment without prejudice and conduct a *Pavey* hearing or (2) if "exhaustion (or its lack) [is] apparent," a *Pavey* hearing is not required, and the court can decide the issue in conjunction with its summary judgment ruling. *Wagoner*, 778 F.3d at 588; see also *Nesbitt v. Villanueva*, 2011 WL 737617, at *3 (N.D. Ill. Feb. 24, 2011) ("[I]f the court can resolve the question of exhaustion based on the affidavits and documentary evidence, it renders a hearing unnecessary."). Thus, the Court will proceed to review the parties' exhaustion arguments and the related evidence, but if there are any disputed factual issues, the Court will be forced to deny Defendants' motion without prejudice in order to conduct a *Pavey* hearing on the issue of exhaustion. See *Schaefer v. Bezy*, 336 F. App'x 558, 560 (7th Cir. 2009);

*Pierce v. Cook Cnty.*, 2014 WL 4376231, at *5 (N.D. Ill. Sept. 4, 2014); *Cruz v. Dart*, 2013 WL 6283687, at *1 (N.D. Ill. Dec. 4, 2013).

### 3.      Exhaustion Analysis

Here, the evidence relevant to the exhaustion issue is discrete: 11 grievances and two letters from the Administrative Review Board. While the Administrative Review Board's letters provide a strong inference that Plaintiff successfully exhausted his administrative remedies for at least some of his grievances, Plaintiff does not make this argument and cryptically avoids affirming or denying Defendants' accusation that he never appealed anything. Instead, Plaintiff argues that he was not required to appeal any of his grievances because in each instance there was no possibility of further relief available to him through the administrative process. See *Thornton v. Snyder*, 428 F.3d 690, 695 (7th Cir. 2005) ("The requirement to exhaust 'all 'available' remedies requires that *some* remedy is available to the inmate through the administrative process, even if not necessarily the relief desired." (quoting *Perez*, 182 F.3d at 538)); *Wilder v. Sutton*, 310 F. App'x 10, 13 (7th Cir. 2009) (listing several instances where administrative remedies are deemed unavailable to an inmate, and noting that a court should "focus on whether the plaintiff did all he could to avail himself of the administrative process"). Specifically, Plaintiff argues that the prison resolved the grievances in his favor, thus leaving nothing to appeal, rendering his un-appealed grievances appropriately exhausted.

### a.      Exhaustion for Continuing Violations

Before digging into the facts, it is relevant to note that Plaintiff alleges a *continuing violation*: that Defendants continually and repeatedly failed to provide him with adequate medical treatment. See *Turley v. Rednour*, 2013 WL 3336713 (7th Cir. July 3, 2013) ("A violation is continuing where 'it would be unreasonable to require or even permit [a prisoner] to

sue separately over every incident of the defendant's unlawful conduct.'" (quoting *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001))). When a plaintiff grieves a continuing violation, he need not file "multiple, successive grievances raising the same issue," and can therefore satisfy his exhaustion requirement "once [the] prison has received notice of, and an opportunity to correct [the] problem." *Id.* And thus courts have found that a plaintiff subject to a continuing violation can satisfy his exhaustion requirement by "fully exhaust[ing] at least one grievance regarding his medical condition." *Plummer v. Wexford Health Sources, Inc.*, 2014 WL 321531, at *5 (S.D. Ill. Jan. 29, 2014); see also *Wilder*, 310 F. App'x at 12 (explaining how the prison failed to process an inmate's first two grievances regarding an alleged continuing violation, which meant that the inmate adequately exhausted his available remedies as to those two grievances such that his failure to appeal his third grievance was irrelevant to the exhaustion inquiry). That being said, the subject matter of the exhausted grievance must actually relate to the actions, policies, or procedures at issue in the case. See *Stites v. Mahoney*, 594 F. App'x 303, 305 (7th Cir. 2015) ("[T]he one grievance that Stites appealed—and thus exhausted—has nothing at all to do with [the] policies [at issue]."). Accordingly, the Court will assess whether Plaintiff adequately exhausted any one of his 11 grievances and whether the subject matter of any sufficiently-exhausted grievances maps onto the alleged wrongs at issue.

### b.      Timing of Exhaustion

Plaintiff submitted five of the grievances in question *after* filing his initial § 1983 Complaint [1 (May 1, 2011)], but *before* filing his First Amended Complaint [59 (Sept. 13, 2012)]. The PLRA requires plaintiffs to exhaust their administrative remedies before filing suit. 42 U.S.C. § 1997e(a) ("No action shall be brought * * * until such administrative remedies as are available are exhausted."); see also *Rodgers v. Freeman*, 2008 WL 4539005, at *2 (N.D. Ind.

Oct. 7, 2008). The question, then, is whether the Court can consider Plaintiff's five post-complaint (but pre-amendment) grievances for purposes of determining whether Plaintiff satisfied the exhaustion requirements of § 1977e(a).

Some district courts in this circuit have outright rejected this premise, noting that "[i]t is settled law in this circuit that a prisoner cannot cure a failure to exhaust administrative remedies before bringing suit by filing an amended complaint after he has exhausted administrative remedies." *Linton v. Randall*, 2011 WL 3678517, at *2 (C.D. Ill. Aug. 22, 2011) (citing *Salgado v. Grams*, 2007 WL 5517481, at *1–2 (W.D. Wis. Apr. 6, 2007) ("No purpose is served in allowing an amendment that will have to be denied promptly.")). But those cases rely on *Perez v. Wisc. Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999), where the Seventh Circuit held that "a suit filed by a prisoner before administrative remedies have been exhausted must be dismissed; the district court lacks discretion to resolve the claim on the merits, even if the prisoner exhausts intra-prison remedies before judgment."[8] While seemingly dispositive of the issue, the *Perez* opinion does not address whether *amending* a complaint can cure a pre-filing deficiency.

The Seventh Circuit addressed this issue in *Barnes v. Briley*, finding that a plaintiff adequately exhausted his administrative remedies via a grievance filed between his initial and first-amended complaints because "[t]he filing of the amended complaint was the functional equivalent of filing a new complaint." *Barnes v. Briley*, 420 F.3d 673, 678 (7th Cir. 2005). That being said, in *Barnes* the plaintiff raised his § 1983 claim *for the first time* in his amended complaint (his initial complaint contained only a Federal Tort Claims Act claim), and the Seventh Circuit noted in dicta that the plaintiff "did not attempt to replead improperly exhausted

---

[8] Section 1977e(a) does not affect the subject-matter jurisdiction of the federal courts, such that "[f]ailure to exhaust administrative remedies does not deprive a court of jurisdiction." *Perez*, 182 F.3d at 535.

claims in his amended complaint," *id.*, implying that it would be problematic to rely on a post-complaint grievance to compensate for a pre-complaint deficiency.

To be sure, it is difficult to square the dicta in *Barnes* with the legal principle driving that opinion, which is that amending a complaint is "the functional equivalent of filing a new complaint." And reading *Barnes* broadly as a bright-line prohibition on post-complaint exhaustion would run counter to the policy promoting judicial economy, wherein certain plaintiffs (like this one) would be forced to incur the expense of filing a new lawsuit when amending would yield essentially the same result. See *Barnes*, 420 F.3d at 678 ("In many instances the procedure for, and effect of, an amendment will be the same as a voluntary dismissal because of the similarities between the governing rules." (quoting MOORE'S FEDERAL PRACTICE § 41.21[2] (3d ed. 2005))). But see *Perez*, 182 F.3d at 535 (dismissing concerns that "it would waste judicial resources to make the plaintiff start over," and holding firm to the prerequisite nature of the "no action shall be brought" language of the statute).

In theory, because amended complaints are (usually) treated as new complaints, allowing a plaintiff to exhaust post-complaint but pre-amendment arguably would not conflict with the "no action shall be brought" language of § 1977e(a) (*i.e.*, because the amended complaint *would be brought* post-exhaustion). Additionally, any concerns about abuse (*e.g.*, using amendment to avoid a statute of limitations problem[9]) could be addressed at the amendment stage, since a plaintiff needs consent from the opposing party or leave from the court to amend. See Fed. R. Civ. P. 15(a)(2). Practically speaking, even if the Court were to read *Barnes* narrowly, the legal principle would be of little help to most plaintiffs with exhaustion issues because (a) defendants

---

[9] See *Wess v. U.S. Gov't*, 2010 WL 4386861, at *2 (N.D. Ill. Oct. 28, 2010) (highlighting the FTCA's six-month filing window before citing a string of cases saying that a premature FTCA complaint cannot be cured through amendment).

are supposed to raise *Pavey* concerns early in a case, before the plaintiff has time to exhaust post-filing and amend (here, a 16-month period), and (b) in most instances, the time to grieve—especially for non-continuing violations—will have passed by the time the plaintiff files his initial complaint, making post-filing exhaustion attempts futile. But in situations like this, where there are no statute-of-limitations concerns, the punitive aspects of forcing Plaintiff to file a new complaint in order to take advantage of a successful post-filing exhaustion are outweighed by the overall gains in efficiency that come from allowing Plaintiff to do so by amending.

As such, the Court will leave open the possibility that Plaintiff can satisfy his exhaustion requirements via a grievance filed after his initial complaint but before his amended complaint.

### c.     The Availability of an Administrative Remedy

As mentioned above, there are several factual scenarios that can excuse a plaintiff of his obligation to exhaust all administrative remedies—*e.g.*, (1) "if grievances must be filed on a particular form, but the forms are not provided," (2) if a prisoner is threatened with violence for attempting to use an administrative process, (3) "if a prisoner is told to wait to file a grievance, and that wait makes the claim untimely," (4) if the prison fails to respond to the grievance, or (5) if the prison engages in affirmative misconduct to prevent a prisoner from exhausting. *Wilder*, 310 F. App'x at 13. "The Supreme Court has stated that so long as the administrative authority has the ability to take *some* action in response to the complaint (even if not the requested action), an administrative remedy is still 'available' under the PLRA." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (citing *Booth v. Churner*, 532 U.S. 731, 741 (2001)). Ultimately, the approach in the Seventh Circuit "has been to focus on whether the plaintiff did all he could to avail himself of the administrative process. If he followed the

prescribed steps and could do nothing more, then available remedies were exhausted." *Wilder*, 301 F. App'x at 13 (citing *Dole*, 438 F.3d at 811).

Plaintiff claims that he didn't appeal any of his 11 grievances because the prison never once denied (on paper) his requests, meaning that appeals were unnecessary and could have jeopardized the favorable decisions. Plaintiff relies heavily on the facts in *Thornton* as his legal hook, where the plaintiff's ability to appeal his grievance was mooted by the prison's corrective actions. *Thornton*, 428 F.3d at 695–96 (inmate requested to be transferred to a new cell and the prison transferred him). Plaintiff argues that his grievances were also mooted, at least in theory, by the prison's promise to comply with his requests. The Court agrees that Plaintiff's situation is analogous to *Thornton*, despite the fact that the prison's mooting of his requests was, in most instances, only theoretical.[10] Thus, if Plaintiff's allegations are true in that the prison provided (or promised) full relief in response to his grievances, then "there was simply no 'remedy' that a higher appeal could provide" to him, "leaving the inmate with nothing to exhaust." *Thornton*, 428 F.3d at at 696 (citations omitted).

### d. Analysis

The next step, of course, is to review the grievances at issue to determine if the prison truly did agree to provide Plaintiff with the relief requested, thus effectively mooting Plaintiffs' need to appeal.

---

[10] Inmates only have 30 days to appeal a grievance where the prison fails to address the problem to the inmate's satisfaction. 20 Ill. Admin. Code § 504.850. Thus, unless a prison's promise to resolve an inmate's grievance dissolves within that 30-day period, the inmate would have no reason to appeal the favorable decision. To hold otherwise would create a loophole for prisons, which could agree to resolve an inmate's grievance, wait 30 days, and then renege on their promise. And the same policy considerations that motivated the *Thornton* court—*i.e.*, that a plaintiff shouldn't be required to risk reversing a favorable ruling just to alert those higher up the administrative-review chain—apply regardless of whether a prison's promise to resolve a grievance is actual or theoretical.

*Plaintiff's First through Fourth Grievances*

| GRV. DATE | RELIEF REQUESTED | RESP. DATE | RECOMMENDATION |
|---|---|---|---|
| 2010. 08.05 | That I be immediately sent to have the x-ray and ultimately seen by Dr. Ghosh for further examination as was requested by Nurse Practitioner L. Williams. | 2011. 01.14 | Based upon a review of all available information it appears the issue has been resolved. |
| 2010. 08.15 | To receive something different than Ibuprofen for the pain, be given the x-ray and any further examination to determine the cause of the things that I'm experiencing with my knee. | | |
| 2010. 09.07 | To be seen by Dr. Ghosh for further examination, to receive[] something other than Ibuprofen for the pain, and to be given the knee brace to possibly help. | | |
| 2010. 09.12 | That I receive something other than Ibuprofen for the pain in my knee. | | |

In these four grievances, Plaintiff requests: (1) to have an x-ray, (2) to be seen by Dr. Ghosh, (3) to be prescribed a stronger pain medication, and (4) to be given a further examination regarding the pain in his knee.

At the time of the response (*i.e.*, January 14, 2011), Plaintiff had received all of the requested care: (1) the x-ray was completed on August 22, 2010, (2) Plaintiff saw Dr. Ghosh on October 12, 2010, (3) Dr. Ghosh prescribed Plaintiff Ultram and a knee brace, and (4) Dr. Ghosh examined Plaintiff (in addition to the initial examination by Ms. Williams) and suggested that Plaintiff receive an MRI to further assess the condition of Plaintiff's knee. The only potential unresolved issue is the fact that the MRI had not yet been performed, but Plaintiff did not grieve about the delay in receiving the MRI. Thus, while Plaintiff may have been dissatisfied with the medical treatment of his knee *in general*, it would be inaccurate to say that this decision failed to adequately address the relief that Plaintiff requested in the specific grievances at issue.

Therefore, as in *Thornton*, Plaintiff received all of his requested relief and thus had nothing to appeal. In addition, these four grievances fully encapsulate the substantive issues raised in Plaintiff's complaint. As such, Plaintiff satisfied his exhaustion requirement.

*Plaintiff's Fifth and Sixth Grievances*

| GRV. DATE | RELIEF REQUESTED | RESP. DATE | RECOMMENDATION |
|---|---|---|---|
| 2011. 02.17 | For the MRI to be conducted to determine the pain and discomfort that I'm experiencing with my knee. But for now, [to be] seen by Dr. Ghosh to prescribe a stronger pain pill. | 2011. 11.21 | Based on a review of all available information, No further action indicated at this time.<br><br>* Grievant should notify his unit counselor if he is not seen on 12/15/11. |
| 2011. 04.03 | That I simply be seen by a doctor to prescribe a stronger pain pill. And to be sent out for the MRI to determine the damage to my knee. | | |

Plaintiff submitted his fifth and sixth grievances approximately six months after his first wave of grievances, although his requests are quite similar: (1) to be given an MRI, (2) to see Dr. Ghosh (again), and (3) to be prescribed an even stronger pain medication.

The grievance officer's response indicated that no further action was required, based on the fact that the MRI had occurred, and that Plaintiff was slated to see Dr. Ghosh on December 15, 2011, where he would be able to discuss his continuing knee troubles and request stronger pain medication. This response did not address all of Plaintiff's issues, and thus Plaintiff needed to appeal the decision in order to satisfy his exhaustion requirements.

Whether Plaintiff appealed this decision (which responded to two grievances) is in dispute. Defendants allege that Plaintiff failed to appeal this decision, but Plaintiff does not clearly affirm or deny that allegation. However, Plaintiff also submitted a response from the Administrative Review Board addressing the grievance officer's decision. [179-1, at 16.] The Board's response does not mention an appeal or whether the appeal was timely, but the Court is unaware of any reason why the Board would have reviewed the grievance officer's decision but for Plaintiff's timely appeal. Were this the deciding factor as to whether Plaintiff sufficiently exhausted his administrative remedies, the Court would be forced to conduct a *Pavey* hearing to determine whether Plaintiff did in fact file a timely appeal as implied by the Administrative

Review Board's decision, but because Plaintiff sufficiently exhausted his first four grievances, the evidentiary hearing is not necessary.

*Plaintiff's Seventh through Eleventh Grievances*

| GRV. DATE | RELIEF REQUESTED | RESP. DATE | RECOMMENDATION |
|---|---|---|---|
| 2011. 07.08 | To see a specialist about my condition and to be given a stronger pain pill for the pain that I experience. | 2012. 01.04 | Issue appears to be resolved as grievant appears to be receiving appropriate medical care at this time. There is no justification for any monetary compensation. |
| 2011. 09.18 | To immediately be seen by the Medical Director about the pain and discomfort to my knee. And to be prescribe[d] a different medication for the pain. | 2012. 01.04 | Issue appears to be resolved as grievant appears to be receiving appropriate medical care at this time. |
| 2011. 10.23 | To be seen immediately by the Medical Director or at sick call to address my condition. | 2013. 01.03 | Issue appears to be resolved as grievant appears to be receiving appropriate medical care at this time. |
| 2011. 11.02 | To be immediately seen by a medical director and something other than the prescribed Naproxen be given for the pain. | | |
| 2012. 02.12 | For the consult to be made to send me out to see an outside orthopedic surgeon. | 2012. 03.21 | Issue appears to be resolved as grievant appears to be receiving appropriate medical care at this time. |

Plaintiff submitted these five grievances *after* filing his complaint in federal court, requesting a range of medical treatment related to his ongoing knee pain. In response to these grievances, the grievance officer indicated that Plaintiff's issues appeared to be resolved when they clearly were not. For grievance seven, Plaintiff requested to be seen by a specialist, but he was seen by Ms. Williams, who is not a specialist. For grievance eight, Plaintiff requested to be seen by the Medical Director *immediately*, but he did not see the Medical Director until three months later. For grievances nine and ten, Plaintiff arguably received the relief requested, but again, not "immediately" as requested. And for grievance eleven, Plaintiff requested to see an orthopedic surgeon, and the grievance officer simply reported that the request was up for collegial review.

The grievance officer did not fully address the requested relief in Plaintiff's seventh through eleventh grievances, and thus Plaintiff needed to file an appeal in order to exhaust his

available administrative remedies for those grievances. But again, while Plaintiff neither affirmed nor denied Defendants' allegation that he failed to appeal these decisions, Plaintiff attached a letter from the Administrative Review Board addressing the adequacy of the grievance officer's response to these five grievances. [179-1, at 17.] While this letter from the Board implies that Plaintiff objected to these five decisions in a timely manner, the Court cannot make such a determination without further input from the parties via a *Pavey* hearing. But again, because Plaintiff sufficiently exhausted his first four grievances, the evidentiary hearing is not necessary.

Because the grievance officer's response to Plaintiff's first four grievances accurately stated that all of Plaintiff's issues had been resolved, Plaintiff had nothing to appeal. These facts put this case squarely within the boundaries of the exhaustion exception articulated in *Thornton*, meaning that Plaintiff successfully exhausted his grievances as required by the PLRA and the Illinois Administrative Code. Thus, whether Plaintiff timely appealed his fifth through eleventh grievances and whether a plaintiff can amend his complaint to cure an exhaustion deficiency are irrelevant. And because Plaintiff's exhaustion is apparent based on admitted facts, a *Pavey* hearing is not required.

### B. Deliberate Indifference

#### 1. Individual Defendants (Current and Former Medical Directors Ghosh, Carter, and Obaisi)

Prison officials and employees violate the Eighth Amendment's proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To succeed on a claim of deliberate indifference, a plaintiff must satisfy both a subjective and an objective component. The objective component requires the prisoner to demonstrate that his medical condition is "objectively,

sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 934 (1994). A serious medical condition "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

The subjective component requires the prisoner to show that the prison employee acted with a "'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (citing *Estelle v. Gamble*, 429 U.S. at 106). The prison employees "must know of and disregard an excessive risk to inmate health; indeed they must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also draw the inference.'" *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 837). To be clear, a plaintiff need not show that the prison official "intended or desired the harm that transpired;" instead, "it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Id.* Regarding delays in medical care, "a prisoner is not required to show that he was literally ignored." *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). The mere fact that a plaintiff "received *some* treatment overlooks the possibility that the treatment [plaintiff] did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Greeno*, 414 F.3d at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). The Court examines the totality of the medical care provided; isolated incidents of delay do not rise to the level of deliberate indifference. See *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000); *Gutierrez v. Peters*, 111 F.3d 1364, 1374–75 (7th Cir. 1997); *Smith v. Dart*, 2013 WL 315742, at *8 (N.D. Ill. Jan. 28, 2013) (collecting cases).

Here, Plaintiff's primary argument is that Defendants were deliberately indifferent because they delayed Plaintiff's medical care. "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007). "Delay is not a factor that is either always, or never, significant. Instead, the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Id*. "Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference," *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012).

Regarding the objective element, Defendants apparently concede that Plaintiff's condition—which was diagnosed by several physicians as requiring treatment—was an objectively serious medical need. As such, the Court will only consider whether the individual actions of Drs. Ghosh, Carter, and Obaisi evince a subjective disregard for Plaintiff's medical condition.

### a. Dr. Ghosh

Plaintiff met with Dr. Ghosh on one occasion: October 12, 2010. Prior to that visit, Dr. Ghosh reviewed Plaintiff's medical records, including the recent x-rays of Plaintiff's knee and the details of Ms. Williams's July 23, 2010 evaluation. Upon evaluating Plaintiff, Dr. Ghosh reported that Plaintiff had degenerative joint disease, likely stemming from the gunshot wound and/or a meniscal tear. The doctor prescribed Plaintiff Naproxen for the pain and ordered Plaintiff a knee brace. Dr. Ghosh recommended sending Plaintiff to an outside specialist for an

MRI but, contrary to his standard practice, he failed to fill out the referral form on the day he examined Plaintiff (or else he lost it). The doctor didn't fill out another referral until January 24, 2011, when he learned of his earlier misstep. Dr. Ghosh testified in his deposition that his inadvertent delay in completing the referral was inadvertent and inconsequential because Plaintiff's chronic knee pain had existed for years and thus there was no need to expedite the MRI. Wexford ultimately reviewed and approved Dr. Ghosh's referral, and Plaintiff received an MRI on May 6, 2011.

Plaintiff argues that Dr. Ghosh needlessly prolonged Plaintiff's pain by delaying treatment despite Plaintiff's serious injury and by failing to follow his own treatment plan. Plaintiff points to Dr. Ghosh's error in failing to submit the referral for Plaintiff's MRI on the date of examination (as is his usual practice) as evidence of the doctor's deliberate indifference.

First, regarding Dr. Ghosh's failure to complete and/or submit the MRI referral form, Plaintiff puts forth no evidence suggesting that Dr. Ghosh's error was intentional or that the doctor was aware of this error at any point prior to January 24, 2011. Instead, Dr. Ghosh testified that the failure to submit the form was inadvertent, and when Dr. Ghosh learned of his mistake, he took steps to remedy that issue as soon as possible, rendering his error, at most, negligent. See, *e.g.*, *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994) ("Negligence is not actionable under the Eighth Amendment.").

Second, even without the MRI referral, Dr. Ghosh still provided Plaintiff with immediate medical care by prescribing him a stronger pain medication and by ordering Plaintiff a knee brace, and under this treatment regime Plaintiff was able work and manage his daily functions (*i.e.*, Dr. Ghosh did not disregard a substantial risk to Plaintiff's health). And while receiving "*some treatment* does not foreclose [Plaintiff's] deliberate indifference claim," based on the

moderate severity of Plaintiff's injuries as reported in his medical evaluations (*i.e.*, Plaintiff's knee demonstrated a full range of motion and good strength and stability [see 179, ¶ 44]), Dr. Ghosh's treatment of Plaintiff, even without the MRI referral, was not "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition.'" *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (emphasis added) (quoting *Greeno*, 414 F.3d at 653).

Third, focusing on the three-and-a-half-month delay between Dr. Ghosh's October 12, 2010 examination of Plaintiff and his January 24, 2011 MRI referral, "[a] delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan*, 612 F.3d at 640–41. Here, Plaintiff provides no "verifying medical evidence" that his condition worsened because of this delay,[11] but he does argue that the delay "unnecessarily prolonged" his serious knee condition. Viewing the facts in the light most favorable to Plaintiff, there is evidence that Plaintiff was forced to endure nearly four months of intermittently serious pain despite the availability of an obvious treatment (*i.e.*, care from a knee specialist). See *Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010) (finding a two-month delay in sending an inmate to a dentist, and finding that "[t]he medical records and [plaintiff's] steady complaints of escalating pain indicate that the delay unreasonably prolonged [plaintiff's] suffering, making summary judgment inappropriate.").

But importantly, the delay in *Berry* stemmed from the defendant's affirmative refusal to treat the plaintiff despite his knowledge of the plaintiff's injury (*i.e.*, the defendant *knew* that he was delaying the plaintiff's medical treatment), whereas here Plaintiff does not dispute that

---

[11] Certain courts disregard the "unreasonably prolonged" prong of this inquiry, and state more definitively that "the action will not lie unless the plaintiff introduces verifying medical evidence that shows his condition worsened because of the delay." *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009); see also *Ortiz v. City of Chi.*, 656 F.3d 523, 535 (7th Cir. 2011).

Dr. Ghosh inadvertently misplaced the MRI referral and thus was unaware that Plaintiff's MRI was delayed as a result. Evidence of a delay, by itself, does not absolve a plaintiff of his duty to establish the knowledge component of a deliberate-indifference claim. And because Plaintiff cannot establish that Dr. Ghosh had knowledge of the delay, he cannot establish that Dr. Ghosh was deliberately indifferent to any harm that arose from that delay.

Plaintiff also notes that he wrote a letter to Dr. Ghosh on September 26, 2010 describing his knee pain and requesting that Dr. Ghosh evaluate him.[12] Specifically, Plaintiff requested a knee brace, a stronger medication, and to discuss the x-ray results with a physician. [179-1, at 1–2.] While letters such as this can be used to show that a defendant knew of (and ignored) a plaintiff's need for medical treatment, here the letter is dated 16 days before Plaintiff saw Dr. Ghosh, whereupon Dr. Ghosh provided Plaintiff with all of the medical care that he had requested in the letter. Even assuming that Dr. Ghosh received the letter and set the appointment for 16 days in the future, there is no evidence that, based on Plaintiff's medical condition, waiting 16 days to see Plaintiff was "a substantial departure from accepted professional judgment, practice, or standards." *Estate of Cole v. Pardue*, 94 F.3d 254, 261–62 (7th Cir. 1996). And Plaintiff provides no evidence that he experienced any harm from this 16-day delay.

Finally, Plaintiff notes that Dr. Ghosh retired in March 2011 and argues that since Dr. Ghosh's only evaluation of Plaintiff occurred in October 2010, this means that Dr. Ghosh deliberately and recklessly withheld treatment from Plaintiff during that entire five-month period. This argument is also unpersuasive. Dr. Ghosh didn't learn of the hold-up in Plaintiff's MRI until January 2011—two months before he retired—at which point he submitted the

---

[12] Plaintiff makes a series of general allegations that he "complained of his knee injury in May 2010, made sick call requests, and wrote formal complaints regarding lack of treatment," [177, at 9], but other than this September 26, 2010 letter, Plaintiff does not allege that he directed any of his other complaints to Dr. Ghosh, or that Dr. Ghosh received any of those complaints.

referral. During the entire five-month period, Plaintiff received treatment for his knee in the form of pain medication and a knee brace, and the MRI—which Dr. Ghosh deemed a non-emergency—was forthcoming. There is no indication that Dr. Ghosh refused to address Plaintiff's knee pain at any time, or that Dr. Ghosh disregarded a substantial risk of harm to Plaintiff. Accordingly, Plaintiff has no triable claim against Dr. Ghosh.

### b.     Dr. Carter

Plaintiff's claim against Dr. Carter is very similar to his claim against Dr. Ghosh, and ultimately fails for the same reasons. Dr. Carter became Stateville Medical Director on July 25, 2011 (*i.e.*, approximately three months after Plaintiff's MRI). Dr. Carter met with Plaintiff on December 15, 2011, based on a recommendation from Physician's Assistant Mr. Williams who evaluated Plaintiff on November 9, 2011. During Plaintiff's visit with Dr. Carter, the doctor advised Plaintiff to continue using his knee brace and prescribed Plaintiff a stronger pain medication, Ultram. Dr. Carter also recommended that Plaintiff see an orthopedic specialist, which he expressed verbally to Plaintiff and noted in his evaluation, but inexplicably the doctor's referral went missing, and so no appointment was scheduled. Plaintiff filed a grievance on February 2, 2012 alerting Stateville medical personnel of his concern that Dr. Carter had failed to complete his referral to send Plaintiff of an orthopedic specialist, and the grievance officer's response referenced a memo dated March 13, 2012 claiming that Wexford personnel would consider the referral in collegial review the following week, although there is no indication as to whether this occurred or whether Dr. Carter was involved with the process in any way. Dr. Carter's tenure as Medical Director ended on May 10, 2012, five months after his evaluation of Plaintiff, and at that time Plaintiff had yet to see an orthopedic specialist.

Plaintiff does not dispute that Dr. Carter treated his knee condition by (1) advising that Plaintiff continue using his knee brace, (2) renewing Plaintiff's permit for his knee brace so that it would not be confiscated by security, (3) prescribing Plaintiff a stronger pain medication, and (4) indicating an intent to refer Plaintiff to an outside specialist for further care. Instead, Plaintiff argues that Dr. Carter's failure to follow through with his recommendation that Plaintiff be seen by an orthopedic specialist amounts to deliberate indifference.[13]

First, regarding the failure to submit a referral for Plaintiff to see an outside specialist, there is no evidence that it was Dr. Carter who made the error, or even if he had, that the error was anything but inadvertent. *Sellers*, 41 F.3d at 1102 ("Negligence is not actionable under the Eighth Amendment."). Plaintiff does not provide any evidence showing that Dr. Carter ever learned of this clerical error or was otherwise aware that Plaintiff was not sent to a specialist. Instead, Dr. Carter testified in his deposition that he expected that, if Wexford approved his referral, Plaintiff would have been evaluated at UIC hospital within three to six months, [179, ¶ 61], meaning that even if Dr. Carter had been awaiting the results of Plaintiff's off-site visit, a five-month delay would not have been unusual or unexpected. Again, at best, Plaintiff has provided evidence showing that Dr. Carter acted negligently in failing to refer Plaintiff to an outside specialist, which is not enough to show deliberate indifference.

---

[13] Plaintiff does not argue that Dr. Carter was deliberately indifferent in failing to respond to the September 5, 2011 letter that Plaintiff sent to him. [See 179, ¶ 8; 179-1, at 9–10.] In that letter, Plaintiff asked the doctor to investigate why Plaintiff's sick-call requests were not being answered, and also to prescribe Plaintiff a stronger pain medication. Dr. Carter did not see Plaintiff until three months later, on December 15, 2011. While a three-month delay in treating a serious medical condition could rise to the level of deliberate indifference, Plaintiff provides no evidence that Dr. Carter received or read the letter, or that Dr. Carter disregarded a serious health risk in response to the letter (in which Plaintiff explained that his condition "hasn't changed"). In addition, Plaintiff was seen by a CMT on three occasions during that three-month period. [See 172-10, at 20–22 (under seal).] Thus, even if Plaintiff hadn't waived this argument, these facts do not present a triable issue for a jury.

Second, Dr. Carter did not ignore a substantial risk to Plaintiff's health. Despite Plaintiff's allegations regarding the sometimes "severe" pain that he experienced, Plaintiff admitted that while on Dr. Carter's treatment regime, he never missed a day of work because of his knee pain and he continued to participate in yard time. And in Plaintiff's February 12, 2012 grievance where he surmised that Dr. Carter failed to submit the referral for Plaintiff to see an orthopedic specialist, Plaintiff didn't grieve of any knee pain, and even mentioned the positive impact of Dr. Carter's decision to switch Plaintiff's pain medication from Naproxen to Ultram. [172-1, at 26–27.] Instead, Plaintiff's only complaint was that he had not been sent to see the orthopedic specialist as Dr. Carter suggested. [*Id.*] But while a specialist's care may have been superior to the treatment that Dr. Carter provided, there is no evidence that Dr. Carter's care— even absent the referral—either harmed Plaintiff or exposed him to a substantial risk of further harm. See *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her.").

Third, Plaintiff argues that Dr. Carter's five-month delay in referring Plaintiff to an outside specialist "unnecessarily prolonged" his knee pain.[14] While a five-month delay in treating a serious medical need raises a red flag, Plaintiff has failed to show that Dr. Carter was aware of the delay (unlike the deliberate denial of care that allowed the plaintiff to defeat summary judgment in *Berry*, see 604 F.3d at 442). This "knowledge" component is vital to a deliberate-indifference claim, and Plaintiff cannot satisfy it. Plaintiff has no triable claim against Dr. Carter.

---

[14] As was the case with his claim against Dr. Ghosh, Plaintiff does not provide any verifying medical evidence that his condition worsened because of this delay, and thus cannot create a genuine issue of material fact as to deliberate indifference, at least according to the line of cases that do not acknowledge the "unnecessarily prolonged" prong to this inquiry. See *Knight*, 590 F.3d at 466.

### c.     Dr. Obaisi

In his Second Amended Complaint, Plaintiff says that he included a claim against Dr. Obaisi in his official capacity "for the purpose of preserving the matter for the recovery of costs and attorney's fees as a prevailing party under 42 U.S.C.A. § 1988." [See 140, at 2.] The Court is not familiar with this practice, and Plaintiff provides no support for the continued inclusion of Dr. Obaisi as a defendant in this matter. Nor does Plaintiff dispute Defendants' allegations that Dr. Obaisi did not act with deliberate indifference to Plaintiff's medical needs (Plaintiff does he even mention Dr. Obaisi in his opposition). [See 177.] As such, Plaintiff can no longer maintain his claim against Dr. Obaisi.

### 2.     Municipal Defendant (Wexford)

A private corporation such as Wexford "cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Respondeat superior* liability does not apply to private corporations under § 1983." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) (citing *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)); see also *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

Defendants argue that Plaintiff cannot show (a) that any of Wexford's written policies were unconstitutional, (b) that any of Wexford's written policies were the moving force behind Plaintiff's injury, or (c) that Wexford condoned or engaged in a widespread practice that was the moving force behind Plaintiff's injury. [See 171, at 16–20.] Surprisingly, despite the fact that Defendants' spent five pages objecting to Plaintiff's claim against Wexford, Plaintiff offered no argument in rebuttal. [See 177.] In their reply brief, Wexford called out this omission, arguing

that Plaintiff's failure to respond to the argument constitutes waiver. [See 185, at 2–3.] Plaintiff did not seek to file a surreply to respond to this allegation.

Defendants are correct that the failure to respond to an argument made in a summary judgment motion results in waiver. See *C & N Corp. v. Kane*, 756 F.3d 1024, 1026 (7th Cir. 2014) (finding that a nonmovant's failure to make an argument in response to a summary judgment motion constituted a waiver of that argument); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument * * * results in waiver."); *Woodruff v. Humana Pharmacy Inc.*, 2014 WL 4269124, at *3 (N.D. Ill. Aug. 29, 2014); *Arroyo v. Volvo Grp. N. Am., LLC*, 2014 WL 4922523, at *9 n.11 (N.D. Ill. Sept. 30, 2014).

But even giving Plaintiff the benefit of the doubt, an in-depth survey of the parties' Local Rule 56.1 factual statements does not reveal discussion of any Wexford policies at play here that the Court could even consider under the *Monell* standard. Regarding whether Wexford engaged in an unconstitutional custom or practice, Plaintiff's allegation seems to be that Wexford has a widespread practice of making inmates wait months for off-site procedures. To succeed in showing that Wexford's actions rose to level of a "widespread practice," Plaintiff would need to show multiple instances of this behavior, which usually (but not always) requires evidence from more than one inmate. See, *e.g.*, *Montague v. Wexford Health Sources, Inc.*, 2014 WL 3724953, at *7 (N.D. Ill. July 24, 2014) (granting summary judgment in Wexford's favor where Plaintiff only introduced evidence of one instance where Wexford delayed his off-site medical appointment by several months); see also *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006) (discussing the contours of the "widespread policy" requirement); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (noting that two, three, or four incidents of improper conduct are not sufficient to support allegations of a widespread practice); *Thomas v. Cook Cnty. Sheriff's*

*Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) ("We do not adopt any bright-line rules defining a 'widespread custom or practice[,]' * * * 'except that it must be more than one instance, or even three.'" (citations omitted)); *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014) (same).

Here, as in *Montague*, Plaintiff only provides facts based on his own experiences with Wexford, and while Plaintiff produced evidence of several extended delays in receiving medical care, at least two of these are attributed to individual errors by Medical Directors (*i.e.*, Dr. Ghosh and Dr. Carter's failures to submit referrals). In one instance Dr. Obaisi submitted a referral for off-site care and Plaintiff waited four months to be seen (November 1, 2012 to March 4, 2013), but (a) this is only a single instance of delay, and (b) Plaintiff does not provide enough information to show that Wexford was responsible for that delay. In other words, Plaintiff does not have enough evidence based on his own experiences to launch a widespread-practice claim against Wexford. Accordingly, on the facts presented before the Court, Plaintiff could not overcome his burden in providing evidence on which the jury could reasonably find for the Plaintiff on his *Monell* claim, even if he hadn't waived it.

### C.    Plaintiff's Claim Against Warden Hardy

Plaintiff included an official-capacity claim against former Stateville Warden Marcus Hardy—the only IDOC (*i.e.*, non-Wexford) Defendant in this matter—"for the purpose of preserving the matter for the recovery of costs and attorney's fees as a prevailing party under 42 U.S.C.A. § 1988." [Second Amd. Compl., 140, at 2 n.1.] As a clerical matter, pursuant to Federal Rule of Civil Procedure 25(d), "when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending[, t]he officer's successor is automatically substituted as a party," meaning that Stateville's current

Warden, Tarry Williams, is the appropriate successor defendant. See, *e.g.*, *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).

Regardless, neither former Warden Hardy nor current Warden Williams moved for summary judgment. That being said, an award of attorneys' fees under § 1988 is available only to a "prevailing party," and because Plaintiff's substantive claims cannot survive summary judgment, Plaintiff no longer has any capacity to become a prevailing party in this action. Thus, as a matter of law, Plaintiff's claim against Warden Hardy cannot survive.

A district court can grant summary judgment *sua sponte* provided that the losing party has (1) proper notice that the district court is considering entering summary judgment and (2) a fair opportunity to present evidence in opposition to the court's entry of summary judgment. *Simpson v. Merchants Recovery Bureau, Inc.*, 171 F.3d 546, 549 (7th Cir. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). While it seems unlikely that Plaintiff will be able to revive his claim against the Warden, out of an abundance of caution the Court gives Plaintiff 30 days from the date of this order either (a) to file a brief explaining to the Court why he should be permitted to proceed on his claim against the Warden, or (b) to dismiss his claim against the Warden. If Plaintiff fails to take either action within 30 days of the date of this order, or if Plaintiff's arguments are not persuasive, the Court will grant summary judgment in favor of Warden Hardy (*i.e.*, his current successor).

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [157] is granted. Plaintiff is given 30 days from the date of this order either (a) to file a motion explaining to the Court why he should be permitted to proceed on his claim against Warden Hardy, or (b) to dismiss his claim against Warden Hardy. If Plaintiff fails to take either action within 30 days of

the date of this order, or if Plaintiff's arguments are not persuasive, the Court will grant summary judgment in favor of Warden Hardy.

Dated: April 13, 2015

_____
Robert M. Dow, Jr.
United States District Judge